(Decided July 11th, 1860.)

---

## Dionysius Sheriff and others *vs.* Benj. O. Lowndes and others.

The Act of 1858, ch. 391, changing the mode of electing trustees of the Bladensburg Academy, from that prescribed by its charter, is *unconstitutional*, no matter whether there were any contributions made to the Academy by individuals, on the faith of the charter, or not.

Appeal from the Circuit Court for Prince George's county.

This appeal is from a *pro forma* order of the court below, (Crain, J.) refusing a *mandamus*, applied for by the appellants, to compel the appellees to deliver up to them the property and custody of the Bladensburg Academy, and to cease to exercise the functions of trustees thereof. The appellants were duly elected trustees of this institution, under the provisions of the Act of 1858, ch. 391. The appellees in their answer to the application for the writ, aver, that this Academy was incorporated and organized under the provisions of the Act of 1815, ch. 185, and that, by force of this Act and that of 1833, ch. 141, the said corporation has continued and the trustees thereof have had succession, and that these respondents are the successors of said trustees, duly elected and qualified, and are in possession and enjoyment of the franchises

and properties of the said Academy, and are entitled by law to possess and enjoy the same, and they insist that the Act of 1858, under color of which the appellants claim title, is unconstitutional and void.

The Act of 1815 incorporates *ten named gentlemen*, by the name and style of "The Trustees of the Bladensburg Academy," and enacts that, by that name, they shall have perpetual succession, and be capable in law to sue and be sued, and to make and use one common seal, and if any of them "shall die, resign, or remove out of Prince George's county, the *remaining trustees shall fill the vacancy* thereby created, at the next meeting that shall happen thereafter," and that it shall be lawful for the trustees of said Academy "to take, receive and hold, for the use of said Academy, any lands and buildings thereon" of a yearly value not exceeding $2000, and with power to raise by lottery a sum not exceeding $5000, the net proceeds of which they shall, within one year thereafter, apply "to the erecting of an academy in or near Bladensburg."

The Act of 1817, ch. 95, (a supplement to that of 1815,) authorizes the trustees of the Bladensburg Academy to raise, by lottery, a sum not exceeding $10,000, and *repeals* all such parts of the preceding law as are repugnant to the provisions of this supplement.

The Act of 1833, the title of which declares it to be "A supplement to an Act, *to revive*" the Acts of 1815 and 1817, by its 1st section enacts, "that the Trustees of the Bladensburg Academy shall be, and they are hereby declared, entitled to the *benefit* of the original Act" of 1815, and its supplement of 1817. The 2nd section, after stating that a new mode of drawing lotteries has been introduced, and that it may be doubtful whether Bladensburg Academy is authorised by the present laws to cause their lottery to be drawn according to such new mode, enacts, "that the Trustees of Bladensburg Academy, or any person or persons who have contracted for or purchased, or may hereafter contract for or purchase, the right to the scheme of a lottery authorized to be drawn for their benefit, shall be at liberty to form, adopt and draw a

scheme of said lottery in such mode and upon such principles as shall or may be approved by the Governor and Council of the State of Maryland." The 3rd section provides, that if the amount authorized by this lottery "be more than sufficient for building Bladensburg Academy, they be, and they are hereby, authorised to use it for the support of a teacher or teachers of the said Academy, or in any way best calculated to promote its utility." The 4th section is: "And whereas, *four deaths have occurred* among the trustees of the Bladensburg Academy; *Be it enacted,* that William Beckett, Christopher C. Hyatt, Benjamin Day and Robert Wright, *be and they are hereby declared trustees to fill said vacancies.*"

The Act of 1858, entitled "An Act to *amend* the Act incorporating the trustees of the Bladensburg Academy," enacts "that the right of appointing the trustees of the Bladensburg Academy in Prince George's county, shall be hereafter, and the same is hereby, *vested in the patrons* of said Academy." The board of trustees, elected in the mode prescribed, is to consist of *nine,* and it is enacted that they "shall succeed to all the rights, privileges and authorities of the trustees of said Academy, as now incorporated by law, or to such of them as may now be legal, and shall take, hold, succeed to and have, the full ownership, as trustees, of all the property and rights now held by the trustees of said Academy, and shall have full authority to manage, direct and administer the affairs of said Academy, to the extent now allowed by law to the present trustees of said Academy," and "all Acts, and parts of Acts, inconsistent with the provisions of this Act, be and the same are hereby repealed," and the board thus elected *"shall have the power of filling all vacancies that may occur in the same at any time hereafter."*

The record contains simply the application for the *mandamus,* and the answer thereto, in which reference is made to these laws.

The cause was argued before LE GRAND, C. J., ECCLESTON and BARTOL, J.

*Oliver Miller* and *Edward W. Belt*, for the appellants:

The only question to be discussed, in this case, is the constitutionality of the Act of 1858, ch. 391. It is not pretended that this law violates any provision of our State Constitution. The objection to it is that it violates that clause of the Constitution of the United States, which declares that no State shall pass any law "*impairing the obligation of contracts.*" In considering this objection, it is obvious, two leading questions arise:

1st. Does there exist, by virtue of the several Acts of Assembly, brought into review in this case, prior to the passage of that of 1858, such a *contract* as is contemplated in this clause of the Constitution of the United States?

2nd. If so, does the Act of 1858, *impair* the *obligation* of that contract?

1st. From a brief review of the Acts of 1815, 1817 and 1833, it will be seen, that the Legislature has done nothing more than *incorporate* the gentlemen named in them, and bestowed upon the corporation thus created, the privilege of drawing a lottery or lotteries, thereby to raise a certain sum of money. The net proceeds of this fund, the corporation is to appropriate to the building of an Academy, and the residue, if any, to the support of a teacher, or teachers, of such Academy, or in any way best calculated to promote its utility. There is not a word in any of these Acts showing that there was any foundation or endowment of this Academy by *private persons*, nor is there any thing in this record to show, that there has ever been any *bestowment*, or *subscription* of funds by individuals, upon the faith of these laws. On the contrary, the funds, like the charter itself, were derived from the unbought bounty of the State. Where charitable or public spirited individuals, desirous of making permanent appropriations for charitable, educational, or other useful purposes, finding it impossible to effect their design securely and certainly, without an incorporating act, apply to the government, state their beneficent object, and offer to advance the money necessary for its accomplishment, provided the government will confer on the instrument that is to execute their designs,

the capacity to execute them, and aid them with its own funds, and the proposition is considered and approved, and the act of incorporation is passed, either simply, or with funds from the public treasury, in aid of the object to be secured; in such cases, the act of incorporation—the charter—becomes a *contract*, over which this clause of the Constitution of the United States is thrown as a protection. The institutions so created, are *private eleemosynary* institutions. In such cases all the elements of a *contract* exist. The charter is granted for a *valuable consideration*. But nothing of all this can be found in the laws in question, or in this record. On the contrary, looking to these laws, the obvious inference from them is, that the Legislature, of its own good will and pleasure, and taking into consideration the duty enjoined upon and inherent in all governments, of promoting the general welfare and the public good, and especially that duty so well expressed in our present Declaration of Rights:—"That the Legislature *ought* to encourage the diffusion of knowledge and virtue, the promotion of literature, the arts, sciences, agriculture, commerce and manufactures, and the general melioration of the condition of the people;"—determined, that an Academy for the advancement of learning and the diffusion of knowledge, should exist in this particular locality, and, as the best means of accomplishing this great *public object*, selected from among the citizens of the State there residing, the ten gentlemen, named in the Acts of 1815 and 1833, and constituted them a *corporation*—made them *trustees* for the execution of a *public trust*—public officers to exercise powers conferred by the public for public objects; and that this corporation might have the means of accomplishing these objects, it was, by the sovereign bounty of the State alone, and by the same act which gave it existence, vested with the power of raising the money in the mode prescribed. From this source alone, all its funds were to be drawn. The object to be thus secured was none the less *public*, because the benefit was to be, or might be, confined to a particular locality; the benefit need not be universal, nor even general, to constitute it a public benefit.

46     v.16

Under the clause of our State Constitution, which authorises private property to be taken for *public use*, it has been decided that the use is none the less *public* because confined to the inhabitants of a single city or county, or district. It is sufficient if any portion of the public are to derive a benefit, through the operation of the corporation. Nor is the bounty any the less derived from the public, because not paid directly from the State Treasury. The power to raise funds by means of a lottery, is a power which could not be exercised without a *grant* from the State. If, through the exercise of the power thus granted, and from no other source, the funds of this corporation were to be and were, in fact, raised, they were and became *public property*, and the Legislature which granted the power, and granted the charter, must be both the *fundator incipiens* and the *fundator perficiens* of the institution so created.

Can it be said then, that a corporation thus created, thus endowed, and for such an object, is a private eleemosynary institution? that trustees thus appointed, with contributions in their hands, derived from such a source, and designed to accomplish such an end, can administer their trust uncontrolled by legislative authority? Is such a charter a *contract*, in the sense in which that word is used in this clause of the Constitution of the United States? It is respectfully submitted that it cannot be so considered, unless the court is ready to affirm the broad doctrine, that every act of incorporation of a college, or an academy, like the present, without reference to the source whence its endowment proceeds, or its funds are drawn, or whether these funds consist wholly of public property, or are the result in part of private donations, is a *contract* within the protection of the Constitution, and utterly and forever beyond the control of the government. Is there any authority for such a doctrine?

In the *Dartmouth College Case*, 4 *Wheat.*, 453, this clause of the Constitution was reviewed by the Supreme Court of the United States. It is needless to speak of the ability of the counsel who argued, and the judges who decided, that cause. The whole history of jurisprudence furnishes no case

more memorable. The question involved was, whether the charter of Dartmouth College was a *contract* within the protection of the Constitution, and we think the grounds upon which that decision rests, and the reasoning of the court, fully sustain the right of our Legislature to pass the Act of 1858. *Chief Justice Marshall,* who delivered the opinion of the court, to which alone we must look for the principles actually decided, declares, that this provision of the Constitution "never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice." He then says, "The parties differ less on general principles, less on the true construction of the Constitution in the abstract, than on the application of those principles to this case, and on the true construction of the charter of 1769. *This is the point on which the cause essentially depends.* If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, *or if the funds of the college be public property,* or if the State of New Hampshire, as a government, be *alone* interested in its transactions, the subject is one in which the Legislature of the State may act, according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States. But if this be a *private eleemosynary* institution endowed with a capacity to take property unconnected with government, *whose funds are bestowed by individuals on the faith of the charter:* if the donors have stipulated for the future disposition and management of these funds in the manner prescribed by themselves, there may be more difficulty in the case, although neither the persons who have made those stipulations, nor those for whose benefit they were made, should be parties to the cause. It becomes then the duty of the court, most seriously to examine this charter, and to ascertain its true character."

It seems impossible to read this language without coming to the conclusion that the court decided, that if the *funds of* Dartmouth College had been *public property,* or if they had not, in whole or in *part,* been *bestowed* by private individuals

on the faith of the charter, the Legislature of New Hampshire would have had the power to pass the laws, which, in that case, were declared unconstitutional. Nor is there any thing in the opinion of *Chief Justice Marshall*, which even looks to a contrary decision, but all his reasoning, and his whole opinion, bears out this position. A few passages from other portions of his opinion will show this:

"From this brief review of the most essential parts of the charter, it is apparent that the *funds* of the *college consisted entirely of private donations.*" "It is then an *eleemosynary*, and as far as respects its funds, a *private corporation.*" "Do its *objects* stamp on it a different character?" "That *education* is an object of *national concern, and a proper subject of legislation, all admit;*" but he then says, education is not altogether in the *hands of the government;* that *donations* for the purpose of education do not necessarily become *public property*, so far that the will of the Legislature, and not the will of the *donor*, becomes the law of the donation; that the idea that this college has become a public institution, cannot be derived from the source whence its funds were drawn, for its foundation is purely *private* and *eleemosynary*, nor from the application of those funds. He then inquires whether it became a public institution from the act of incorporation, and decides that it did not; that from the fact of a charter of incorporation nothing can be inferred which changes the character of the institution, or transfers to the government any new power over it; that the character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created; that the same institutions, created for the same object, though not incorporated, would be public institutions, "and of course be controllable by the Legislature;" that the incorporating act neither gives *nor prevents* this control; and that neither, in reason, can the incorporating act change the character of a *private eleemosynary institution*. He then enquires for whose benefit the property given to this college was secured, and decides that the beneficial interest was not in the people of New Hampshire: "From

this review of the charter it appears that Dartmouth college is an *eleemosynary* institution, incorporated for the purpose of perpetuating the *bounty of the donors* to the specified objects of that bounty." "This is plainly a *contract* to which the donors, the trustees and the crown, (to whose rights and obligations New Hampshire succeeds,) were the original parties. It is a contract made on a *valuable consideration. It is a contract for the security and disposition of property. It is a contract, on the faith of which real and personal estate has been conveyed to the corporation.* It is *then* a contract within the letter of the Constitution, unless the fact that the property is invested by the donors in trustees for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception, taking this case out of the prohibition contained in the Constitution:" and he then decides that this exception can stand on no safe and intelligible ground. Such is the argument and opinion of *Chief Justice Marshall,* on this point.

Perfectly consistent therewith is the opinion and reasoning of *Justice Washington,* who says: "These corporations, civil and eleemosynary, which differ from each other so especially in their nature and constitution, may very well differ in matters which concerns their rights and privileges, and their existence and subjection to public control. The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the king or government may bestow upon it, and having no other founder or visiter than the king or government, the *fundator incipiens.* The validity and justice of its laws and constitution, are examinable by the courts having jurisdiction over them, and they are subject to the general law of the land. It would seem reasonable that such a corporation may be controlled and its constitution altered and amended by the government, in such manner as the public interest may require. Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it, the trustees or

governors of the corporation being merely the trustees for the public, the *cestui que trust* of the foundation. These trustees or governors have no interest, no privileges or immunities, which are violated by such interference, and can have no more right to complain of them than an ordinary trustee who is called upon in a court of equity to execute the trust." (Is not this a perfect description of the trustees of the Bladensburg Academy?) "They accept the charter for the *public benefit alone*, and there would seem to be no reason why the government, under proper limitations, *should not alter or modify such a grant* at pleasure. But the case of a *private corporation* is entirely different. That is the *creature of private benefaction* for a charity or private purpose. It is *endowed and founded by private persons*, and subject to their control, and laws, and visitation, and not to the general control of the government; *and all these powers, rights and privileges, flow from the property of the founder in the funds assigned for the support of the charity*. Although the king by the grant of the charter, is in some sense the founder of all eleemosynary corporations, because without his grant they cannot exist, yet the patron or endower is the perficient founder, to whom belongs, as of legal right, all the powers and privileges which have been described. With *such a corporation* it is not competent for the Legislature to interfere. It is a franchise, or incorporeal hereditament, *founded on private property* devoted by its patron to a private charity of a peculiar kind, the offspring of his own will and pleasure, to be managed and visited by persons of his own appointment, according to such laws as he or the person so selected may ordain."

Whence, and for what purpose, these labored arguments upon the facts, that Dartmouth College was the creature of *private benefactions*,—that its *funds* consisted, entirely, of *private donations*,—that property was *contributed* and *conveyed to it on the faith of the charter*,—that it was *founded* and *endowed* by *private munificence* alone:—if the *law* and the decision would have been the same had its funds been *public property*, derived from the bounty of the *State* alone?

and if the *State* had not only granted its charter, but had, also, been *its only founder* and *endower ?*

It is true, there are some expressions in the opinion of *Justice Story*, and some doctrines stated, which seem to lead to a contrary conclusion. But, when he says, for instance, "that a grant of franchise is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a *pure donation*, when the grant was complete, and accepted by the grantees, it involved a *contract* that the grantees should hold, and the grantor should not resume, the grant, *as much as if it had been founded on the most valuable consideration;*" and when he further denies that *any consideration* is necessary to make the charter a *valid contract*, it is submitted that, if he is to be understood as declaring that *every act* incorporating a college is a *contract*, and that it would have made no difference to the decision in that case, whether the college was endowed by private munificence, or by the *State alone*, whether its funds were public or private property, he was departing from the line of argument adopted by the court, and deciding questions not necessary for the decision of the case before him. So when he declares that, *"A private donation* vested in a trustee for objects of a general nature, does not thereby become a *public trust*, which the government may, at its pleasure, take from the trustee, and administer in its own way," he is announcing the same law, and adopting the same reasoning, that the court announced and adopted. But when he further adds: "The truth is, that the government has no power to revoke a grant, *even of its own funds*, when given to a private person, or a corporation, for special uses. It cannot recall its own endowments granted to any hospital, or college, or city or town, for the use of such corporations. The only authority remaining to the government is *judicial*, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds, and, if the uses are charitable, to secure their regular administration through means of *equitable tribunals*, in cases where there would be a failure of justice;" it is again respectfully submitted, that if this language is to be taken as declar-

ing that the State, when it has, *alone, founded* and *endowed,* out of the *public funds,* a literary institution, is inhibited, by the *mere fact of granting a charter* to such institution, from ever afterwards interfering in the management of that fund, by *legislative* control, over the mode of appointing its trustees, he is to be regarded as expressing his own individual opinions, and not as announcing the decision of the court on such a question.

The case of *St. John's College,* 15 *Md. Rep.,* 330, like that of *Dartmouth College,* was a case where the charter disclosed the fact, that *private funds* had been subscribed and procured for the founding of the college. It was admitted that the sum so contributed by private individuals and corporations, amounted to $32,000. These contributions were made upon the *faith of the charter,* in which the State, on its part, had made a donation for the use of the college. This charter the court held to be a *contract* within the clause of the Constitution of the United States. It was so held, because of the fact, that the college derived its funds, in part, from *private bounty,* from private contributions made on the *faith of the charter.*

The case of the *Abington Academy,* 7 *G. & J.,* 7, it is submitted, is unlike the present. The Act of 1829, ch. 37, the charter of that Academy, which, in that case, was held to be within the protection of the Constitution, contains provisions totally unlike those in the laws now under review. Its 1st section incorporates certain named persons, "and such other persons as *now are* or *may hereafter become subscribers,* and their successors," by the name of the Trustees of the Abington Academy. In another section, these corporators are called "*subscribers or stockholders,*" and are authorised to hold real and personal estate to the amount of $20,000. And by the 6th section, it is enacted: "That *the surplus profits,* if any, derived from the said Academy, after defraying the necessary expenses thereof, shall be divided, and paid over to those persons who may have subscribed to the same, and paid their respective subscriptions, according to the *number of shares* by them respectively held: *Provided, nevertheless,*

that such dividend shall, in no case, exceed *six per centum per annum* on the original subscription." The next section enacts: "That the buildings and estate of the said Abington Academy shall be and remain free and exempt from taxation for county purposes." In another part of the charter it is provided, that books shall be kept of the names of the subscribers, and the amount subscribed, and every subscriber shall be allowed in the election of the trustees, *"one vote for every ten dollars by him or her subscribed and paid."* From these provisions, it is obvious this was the charter of a *joint stock company,* with a capital of $20,000, divided into shares of ten dollars each, subscribed, or to be subscribed, altogether by private individuals, who expected to make *profits* from the investment so made. It resembles, more than anything else, a *bank charter,* where the funds are to be managed, and the services performed, exclusively for the use and benefit of the *stockholders,* and is, in every respect, unlike the charter of a literary institution, endowed by the bounty of the State.

From these considerations we insist, that in these several Acts of Assembly there can be found no such *contract* as is contemplated in this clause of the Constitution of the United States.

2nd. But suppose such a contract is to be found in these several laws, or any of them, the next question is, does the Act of 1858 impair the obligation of that contract? This brings us to consider the *construction* of these laws, and particularly that of 1833.

From 1815 to 1833 *eighteen years* had elapsed, and nothing appears to have been done by the original trustees in execution of the powers conferred upon them by the original charter and its supplement of 1817. Now, it is the well settled law of corporations, that an eleemosynary, like every other corporation, may forfeit its corporate franchises by misuser or *non-user of them.* 4 *Wheat.,* 676. It is evident, from the Act of 1833, that the Legislature assumed that the franchises granted by the Acts of 1815 and 1817, had been forfeited by *non-user,* for by its *title* it is declared to be an Act, not to amend, but to *"revive,"* the original Act and its

47    v. 16

supplement. This Act of 1833, is therefore to be considered as a *new* charter granted in place of the old one, which had been forfeited. This construction is obvious from the terms of the Act itself, for it gives to the trustees of Bladensburg Academy, "the *benefit* of the original Act and supplement," and then finding that *four* of the original trustees had died, it constitutes and incorporates a *new board* by taking the six surviving trustees, and adding to them, by direct *legislative appointment*, four *new* named parties.

There is *no provision* in this Act for *filling vacancies* in the new board, *so constituted and incorporated*, unless the power of *filling vacancies* by the board itself, contained in the Act of 1815, is embraced in the term *"benefit,"* in the 1st sec. of this Act of 1833. Such a construction however is liable to grave and serious objections. The *benefit* intended to be conferred upon the *new board* was, obviously, nothing more than than the *lottery grant or grants* mentioned in the original Act and its supplement. We cannot suppose the Legislature intended more than this. If the power to *fill vacancies* was revived by the 1st section, then the 4th section was unauthorized. and was just as much an unwarranted invasion of the charter, as the Act of 1858 possibly could be. It must be remembered that the constitutionality of the Act of 1833, is not now in question; it is conceded to be constitutional, and the only title which the present appellees have to their offices as trustees, is derived *through this Act*. This Act is certainly susceptible of the construction we place upon it, and in construing charters the rule is, "Where the charter may be taken to *two intents*, each of which are good and effectual, in many cases it shall be taken to such intent as is most beneficial to the king. And *generally* the grant of the king is to be taken *more strongly against a stranger, and more favorably for himself, contrary to the rule of the common law*, in the case of a grant by a subject." (*Grant on Corp.*, 38.) In other words, the State is not to be considered as having parted with, or granted more than the charter, by express terms, or strict construction in favor of the State, grants or embraces. Again, it is not to be *presumed* that the

Legislature has transcended its powers and passed an *uncon-
stitutional law*. By the construction on the other side, the
Act of 1833, as well as that of 1858, must be held to be un-
constitutional, whereas, by our construction, *both* are perfectly
*valid*. If the franchises had been forfeited by *non-user*, as
must be presumed, and the Act of 1833 revived only so much
of the Acts of 1815 and 1817, as conferred on the trustees
the *"benefit"* of the lottery grants, as the Act on its face
plainly indicates, then it was perfectly competent for the Leg-
islature to create a new corporation with a new board of trus-
tees, *and having in that Act omitted to provide for the filling
of vacancies in such board, it was perfectly competent for
the Legislature, by the Act of 1858, to provide for the elec-
tion of the trustees in the mode therein prescribed*. By re-
ference to the answer in this record it will appear, that but
*two* of the board created by the of Act of 1833 are members
of the board now professing to act as trustees. The eight
vacancies in that board, occurring since 1833, must, there-
fore, have been filled by the board itself without authority of
law, according to our construction of these Acts; and the
Legislature of 1858, seeing this state of things, and that but
*two* of this board of trustees survived or had the right to act
as such, interposed to *preserve* the corporation not to *impair*
the obligation of its charter, and provided for the *perpetua-
tion* of the franchises granted by the several preceding laws.
If this be the true construction of the Acts of 1833 and 1858,
there was no *impairing* of the obligation of any contract, but
the *preservation* of the franchise. What right had the eight
appellees, who held their offices as trustees without authority
of law, who were attempting to administer this fund derived
from the bounty of the State, and devoted by the State to
public uses and public purposes, to complain of this Act?
What interest of theirs, beneficial or otherwise, was *injuri-
ously affected* by this law? Was it not altogether more ap-
propriate that the management of this fund, to whose crea-
tion no private individual, so far as these laws and this record
shows, contributed one farthing, should be entrusted to the

*patrons* of the academy, that the beneficiaries of the trust should have the selection of the trustees, who were to administer the trust funds bestowed by the bounty of the State alone?

We therefore insist, that the Act of 1858 does not impair any contract to be found in the pre-existing laws, relating to this Academy.

There are, also, other considerations which ought to have weight in the determination of this case. From the beginning the Legislature has assumed control over this institution, with the *assent* and *acquiescence* of all parties interested, both trustees and *cestui que trusts*. The Act of 1817 *repeals* all inconsistent provisions in the prior Act of 1815.

The Act of 1833 pays no regard to the prior laws, so far as the appointment of the board of trustees is concerned, and the present appellees hold their office under a law just as unconstitutional, if their views are correct, as that of 1858. The Act of 1858, does no more violence to the Act of 1833 than that Act does to that of 1815. The Legislature has always regarded this institution as under its protection and control. It has exercised the same control over it, that any private founder of a college would exercise without an act of incorporation, over the creature of his own bounty. From time to time it has changed the trustees who are to administer this trust, and the courts must presume it did so for good reasons. All this too has been done without complaint, without contest from any quarter, or on the part of any one. The original trustees made no objection to the appointment of a new board in 1833. It would indeed seem to be a trust which parties, so far from being desirous to retain, would gladly surrender to the patrons of the institution, or to those whom they might select to administer the State's bounty. The donation is not withdrawn from the institution, by this act, its administration is simply placed in other hands, and, in so doing, no *vested* right has been *divested*, nor has, it is respectfully submitted, the *obligation* of any *contract* been impaired.

*Thos. S. Alexander,* for the appellees:

The validity of the Act of 1833, under which, it is sup-
posed, the appellees claim title, is not involved in the present
controversy. The appellees are in possession, and are to be
displaced only, at the suit of those who show a better title.
It is competent to a corporation to accept an amendment to
its charter. By such acceptance it does not deprive itself of
its right to resist all subsequent Legislative encroachment. If,
then, the Act of 1833 was accepted, and if the appellees
claim under that Act, they are at full liberty to deny the con-
stitutionality of the Act of 1858, under which the appellants
claim title. If the Academy is a private corporation, within
the purview of the Constitution of the United States, it is
conceded by the argument on behalf of the appellants that
the Act of 1858 is void, as impairing the obligation of the
contract between the State and the Academy. Is it a *public*
or a *private* corporation? This is the question. The ques-
tion seems to be concluded by *Norris vs. The Trustees of
the Abingdon Academy,* 7 *G. & J.,* 7, and the *Dartmouth
College Case,* 4 *Wheat.,* 453. But it is said that in those
cases there were private contributors, becoming such on the
faith of the charter. In the present case, it is assumed,
the only endowment of the academy was made by the
State. We insist, that if the matter of fact, thus assumed,
were proved, it would not influence the question in regard to
the character of the corporation. This court, in 9 *G. & J.,*
397, *The Regents vs. Williams,* instructs us, that "a pub-
lic corporation is one that is created for public purposes, with
political powers, to be exercised for purposes connected with
the public good, in the administration of civil government;
an instrument of government subject to the control of the
Legislature, and its members officers of the government for
the administration or discharge of public duties." The next
paragraph contains the argument, which is just as applicable
to the present case as it was to that of the University: "The
corporation of the University has none of the characteristics
of a public corporation. It is not a municipal corporation.
It was not created for political purposes, and is invested with

no political powers. It is not an instrument created for its own uses, nor are its members officers of the government, or subject to its control in the due management of its affairs; and none of its property or funds belong to the government: the State was not the *founder*, in the sense of that term, as applied to corporations. It was the creator, only, by means of the act of incorporation, and may be called the *incipient*, not the *perficient*, founder. It gave to it, in its creation, the capacity to acquire and to hold property, but made to it no donation." "It is said there have been subsequent endowments by the State. If it be so, that cannot affect the character of this corporation. If eleemosynary and private at first, no subsequent endowment of it by the State could change its character and make it public. *But it no where appears that any such endowments have been made.* Several Acts of Assembly were passed, authorizing money to be raised by lottery for the use of the University." "The authority to raise money merely, certainly was not an endowment; it was a mere privilege granted, which cost the State nothing." "If it is a public corporation, and its members the officers or agents of the government, and the debts contracted in the due course of that agency, they were debts of the State, contracted by its own officers, which the State was bound to discharge." "All the authorities agree, that colleges and academies, established for the promotion of learning and piety, and endowed with property by public and private donations, are, in a legal sense, equally with hospitals for the relief of the poor, sick, &c., considered and treated as private eleemosynary corporations." "The extent of the property or funds it may have acquired by donation or otherwise, is not material; *the capacity expressly given to acquire* and hold property in perpetuity, for the uses and purposes of its institution, is *the same thing*, so far as concerns its character as a corporation, *as the actual acquisition of it would be.*"

Now, to apply these principles. By referring to the original Act of incorporation of 1815, we find that the trustees are empowered "to take, receive and hold, for the use of said academy, any lands and the buildings thereon." Here

is *the capacity to take,* which, like the *actual acquisition,* confers on the corporation its private and eleemosynary character. By this and the Act of 1817, authority is given to the trustees to raise money by lottery for the use of the academy. But this *authority* is certainly not *an endowment.* There was no public endowment made at the time of incorporation, or at any time subsequent. And it is, so far as proof extends, uncertain, whether the academy, and its site, were acquired by private donation, or by the avails of the lottery grant. As the Act of 1833 speaks only of the building of the academy with the avails of the grant, the inference is, that the lot had already been acquired by gift of some public spirited individual. Upon the authority of the *Regents'* *Case,* a private contribution to any amount, made at any time subsequent to the incorporation, would not stamp the academy with an eleemosynary character—a contribution made at the present time would not have that effect. It cannot be that a corporation shall acquire its character by *ex post facto* matter in the country;—that a corporation, created a public corporation by the letter of its charter, shall become private by a subsequent transaction, *in pais,* between the corporation and an individual. If it is public in its inception, it must remain, during its existence, a public corporation. If there is a *capacity* to take from private sources, it will be in its inception a private corporation, and will remain a private corporation, although, in point of fact, no private endowment is made to it. Such is the teaching of the *Regents' Case,* and if additional authority is required, it may be found in the opinion of *Justice Story,* in 4 *Wheat.,* 668, 672.

Le Grand, C. J., delivered the opinion of this court:

The only question involved in this case is the constitutionality of the Act of 1858, chapter 391. It is under this Act, and the election had in pursuance of its provisions, that the appellants claim to be invested with the powers, and to be charged with the duties, of trustees to the Bladensburg Academy.

It has been contended, with much ability, that the Act of 1858 is not a law impairing the obligation of a contract, within the meaning of the Constitution of the United States, and that the Bladensburg Academy is not, within the meaning of the law, a *private* corporation, but one of a *public* nature, and subject to the control of the Legislature. The decision of the *Dartmouth College Case,* 4 *Wheaton,* was placed, by *Chief Justice Marshall,* on the ground of contract, and the existence of a contract he principally deduced from the fact, that individuals had contributed to the establishment and endowment of the college, out of their private funds. That case did not require the court to go any farther than to decide what was the nature of a corporation, under the Constitution of the United States, which existed because of the contributions made by individuals, on the faith of the charter. The *Chief Justice,* in pronouncing judgment, did not go beyond the case presented to the court by the record; *Justice Story,* however, did, and announced, as his own opinion, that a *donation* to a corporation, by the State, could not be reclaimed. This opinion of his constitutes no part of the decision of the Supreme Court, and is but entitled to the respect due to any other opinion of so eminent a jurist.

It does not appear, from the record, whether or not there were any contributions, on the part of individuals, to the corporation. It may be, that the Academy was built, and its possessions acquired, by the funds of individuals, relying on the faith of the Act of incorporation. But, supposing the fact to have been otherwise, under the decisions in this State, the case would not be altered. We are concluded by them.

The case of *Norris vs. The Trustees of the Abington Academy,* 7 *G. & J.,* 7, is fully up to the point involved in this appeal, and conclusive as to the unconstitutionality of the Act of 1858. That case was much stronger than the one now before us. There, all the property of the Academy had been transferred to the State, and thereby, as was argued, to that extent, giving the State some control over it. There is no question of *donation* here, it is simply one of *government,* and we do not perceive, so far as it is concerned, wherein the

JUNE TERM, 1860.       **377**

Howell's ex'crs *vs.* Balto. Equitable Society.

case differs from that of the Abingdon Academy.   That case was re-affirmed by the Court of Appeals in 9 *G. & J.*, 413.

*Order affirmed.*

(Decided July 12th, 1860.)