In the Matter of THE MOUNT SINAI HOSPITAL.

Petition of JULIUS GOLDMAN and MEYER M. FRIEND to Review and Set Aside the Election of JACOB EMSHEIMER, ALBERT FORSCH, CHARLES KLINGENSTEIN, WALDEMAR KOPS, BENJAMIN MORDECAI and ADOLPH LEWISOHN, as Trustees.

Supreme Court, New York County, December 31, 1926.

Corporations — charitable corporations — application to set aside election of trustees of Mount Sinai Hospital — hospital was incorporated under Laws of 1848, chap. 319, which required election annually of trustees and directors by members of corporation — Laws of 1925, chap. 17, which altered method of election of trustees by requiring election annually by majority vote of remaining members of board, is constitutional — petitioners have not suffered loss of valuable property rights by removal of right to select trustees — said amendment to charter does not impair obligation of contract nor violate State or Federal Constitutions with reference to due process of law, nor does it violate Fourteenth Amendment of United States Constitution — constitutionality of statute of Legislature cannot depend upon influences brought to bear to obtain its enactment nor upon motives which may have inspired Legislature to act — affiliation of hospital as constituent member of Federation for Support of Jewish Philanthropic Societies of New York City did not terminate existence of individual membership in hospital corporation.

Chapter 17 of the Laws of 1925, which amended the charter of the Mount Sinai Hospital, a charitable corporation, relative to the method of selecting the trustees of said hospital, who had been elected annually by the members of the corporation since its incorporation in 1852, pursuant to chapter 319 of the

Laws of 1848, by providing that said trustees would be elected annually by a majority vote of the remaining members of the board, is constitutional, though it deprives the members of the hospital corporation of the opportunity to elect trustees, for the statute under which the hospital was incorporated reserved to the Legislature the right to amend the charter of the corporation so as to exclude its members from voting for its trustees and to vest in the existing board of trustees the right to elect their successors.

While the right to vote for the directors of a business corporation is a valuable property right, which cannot be extinguished by the Legislature under its reserve power to amend, annul or repeal the charter of any corporation, the right of members of a charitable corporation is not a property right severable from legislative grant of the charter, and, consequently, the petitioners herein, who seek to set aside an election of trustees of said hospital had pursuant to the aforesaid amendment, have not suffered a loss of valuable property rights by being excluded from the right to select the trustees of the hospital, for said right did not exist independently of the corporation charter, but was created by the charter itself and could be destroyed by the Legislature at will.

Nor does the amendment violate those provisions of the Federal and State Constitutions (U. S. Const. art. 1, § 10; Id. 14th Amendt., § 1; N. Y. State Const. art. 1, §§ 1, 6) which forbid the impairment of the obligation of contracts and the taking of property without due process of law, for the statute represents a constitutional exercise of the reserve power by which the Legislature might at any time amend, annul or repeal said charter of the hospital.

The Legislature has not singled out for disfranchisement the members of the Mount Sinai Hospital to the exclusion of other corporations similarly situated and incorporated under chapter 319 of the Laws of 1848 and thus denied to the members of the hospital the equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution, for the Legislature may exercise its reserve power to amend or repeal corporate charters without regard to the constitutional guaranty of the equal protection of the law and may properly discriminate in its exercise of that reserve power without running counter to the equal protection provisions of the Fourteenth Amendment to the United States Constitution.

Nor can the amendment be complained of upon the ground that it changes the corporation from a democracy to a perpetual oligarchy and that the only purpose which actuated the trustees was the desire to perpetuate themselves in power and to prevent a failure to re-elect them as their terms · expire, for the constitutionality of an act of the Legislature can neither depend upon the influences brought to bear to obtain its enactment nor upon the motives which may have impelled the Legislature to act.

The affiliation of the hospital as a constituent member of the Federation for the Support of Jewish Philanthropic Societies in New York City did not terminate the existence of individual membership in the hospital corporation in the, absence of proof that the provision for the termination of membership contained in the charter of the hospital had ever been invoked and the names of the members of the hospital stricken from the roll in accordance therewith; the petitioners, therefore, must be regarded as members of the hospital corporation and as such, entitled to attack the constitutionality of the statute, in the absence of evidence that their names have been stricken from said membership roll.

APPLICATION under section 32 of the General Corporation Law for an order setting aside an election of trustees of The Mount Sinai Hospital, and directing a new election.

*Engelhard, Pollak, Pitcher & Stern* [*Walter H. Pollak* and *Carl S. Stern* of counsel], for the petitioners.

*Henry F. Wolff* [*Charles E. Hughes, Garrard Glenn* and *Benjamin Tuska* of counsel], for the respondents.

LEVY, J.  This is an application by petitioners under section 32 of the General Corporation Law for an order (1) setting aside an election of six trustees of The Mount Sinai Hospital, held on the 26th day of March, 1925, and (2) directing a new election. The challenge of the validity of the election is based upon constitutional objections to the statute which last amended the charter of that hospital corporation.  It is, therefore, necessary to consider at some length the statutory grant of power by which the corporation was brought into being, as well as the amendments succeeding, and more particularly perhaps, the most recent legislative enactment.

Chapter 319 of the Laws of 1848, entitled "An act for the incorporation of benevolent, charitable, scientific and missionary societies," authorized any five or more persons to associate themselves into a society for the purposes, or any of them, indicated in the title of the act, by filing a proper certificate approved by a justice of this court.  It was pursuant to this statute that The Mount Sinai Hospital was incorporated in 1852, under the name of "The Jews' Hospital in New York," by the filing of a duly approved certificate, which provided for nine *directors*, later called *trustees*, and enumerated the directors for the first year of the society's existence.  The certificate indicated, by express reference to the subject, that it was contemplated that additional members would be admitted thereafter.  By chapter 651 of the Laws of 1857 the Legislature amended the constitution of the hospital, among other things, by increasing the number of directors to twelve, and providing for their classification into four groups of three each, one group to be elected annually.  Thereafter, the number of directors was augmented from time to time by the filing of proper certificates and by amendments to the constitution, until in 1922 the board consisted, as it does to-day, of forty-two members, divided into seven classes of six each, one class elected annually.  By chapter 627 of the Laws of 1866 the name of the hospital was changed to its present designation, The Mount Sinai Hospital, and by chapter 80 of the Laws of 1918 it was provided that the board of directors should thereafter be known as the board of trustees.

The constitution of the hospital as it read on March 26, 1925, the date of the alleged illegal election, provided for the choice of

six trustees at each annual meeting " of the *members of the Society.*" The act of 1848, pursuant to which the hospital had been incorporated, provided that " The *society* so incorporated may annually elect from its members its trustees, directors or managers, at such time and place, and in such manner as may be specified in its by-laws." Chapter 651 of the Laws of 1857, which amended the constitution of the hospital, provided that the directors were to be " annually elected by the *members* of the society." In 1895 the various statutes relating to incorporated societies were consolidated into the Membership Corporations Law of 1895 (Laws of 1895, chap. 559). The Membership Corporations Law of 1926 (Laws of 1926, chap. 722), section 45, provides as follows: " The directors of a membership corporation other than those named in its certificate of incorporation shall be elected *by the members* and other persons entitled to vote therefor." (Italics mine.) Similar provision for election of directors by the *members* is made in section 23 of the General Corporation Law, which has for some time provided that " at every meeting of a non-stock corporation, every member, unless disqualified by the by-laws, shall be entitled to one vote."

In accordance with the various laws cited and the provisions of the constitution of The Mount Sinai Hospital, its directors or trustees, as they have been from time to time denominated, had been elected by the *members* of the society since its formation in the year 1852. In February, 1925, however, as a result of the efforts of the trustees, chapter 17 of the Laws of 1925 was enacted into law. The effect of this statute was to deprive the members of the hospital of the opportunity to elect trustees, and to transfer that right to the trustees themselves. A self-perpetuating board was thus created. The act reads as follows:

" An act providing that the board of trustees of the Mount Sinai Hospital be elected annually by majority vote of the remaining members of the board.

" Section 1. The various classes of the board of trustees of The Mount Sinai Hospital, as now constituted, shall continue in office until the expiration of their respective terms, and the successors of said respective classes shall be elected by a majority vote of the remaining members of the board of trustees annually upon the expiration of the terms of said respective classes.

" § 2. Any act or acts inconsistent with this act are hereby repealed.

" § 3. This act shall take effect immediately."

The next annual meeting of the society after the passage of this act was held on March 22, 1925, but no election of trustees was

had.  At that meeting the president announced the enactment of the new law, and ascribed its passage to the efforts of the trustees. A resolution was thereupon adopted by the unanimous vote of those present, approving the president's report and ratifying and confirming the actions and proceedings of the trustees in this connection.  On March 26, 1925, the trustees met and elected Jacob Emsheimer, Albert Forsch, Charles Klingenstein, Waldemar Kops, Benjamin Mordecai and Adolph Lewisohn as trustees for a term of seven years, expiring in March, 1931.  Thereafter this application was made to set aside the election of March twenty-sixth and to direct a new election.  The grounds urged are: (1) That chapter 17 of the Laws of 1925 is unconstitutional and beyond the reserved power of the Legislature in that it deprives the members of the hospital of their right to vote for its trustees and thereby confiscates what petitioners maintain is a valuable property right; (2) that the given statute is also unconstitutional in that it singles out for disfranchisement the members of The Mount Sinai Hospital without disfranchising the members of corporations similarly situated — thereby, according to petitioners, denying to the members of the hospital the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States.

The petition is jointly made and verified by Julius Goldman and Meyer M. Friend, both members of the New York bar for more than fifty years and both claiming to be now and for many years past, members in good standing of The Mount Sinai Hospital. Neither petitioner was aware of the passage of the act, or even that such a statute was in contemplation, and the very first light upon the subject came to them more than ten days after the act had actually gone into effect; nor did either attend the annual meeting on the 22d day of March, 1925, or participate in the ratification of the action of the trustees in securing the passage of the law.  The notice of the annual meeting had contained no reference to the law or to the fact that ratification of its enactment would be sought at the meeting.  Moreover, there was nothing in the notice to indicate even remotely that the trustees would not be elected by the members in accordance with the practice which had prevailed for over seventy years.  Prior to the meeting petitioner Goldman had lodged a protest with the trustees against their taking any action under the new statute and had demanded that all trustees be elected as they had been in the past, that is to say, by the members of the society at its annual meetings.  Goldman's demand evidently went unheeded, and the six trustees to be elected were chosen by the remaining trustees.

Before proceeding to a discussion of the constitutional questions

presented, it becomes necessary to examine into a preliminary matter which has received considerable attention in the affidavits and briefs, the clarification of which is a matter of seeming public importance. In 1917, by chapter 269 of the Laws of that year, there was incorporated an organization known as the " Federation for the Support of Jewish Philanthropic Societies of New York City," for convenience hereinafter referred to as *Federation*. One of its prime and obviously laudable objects was to act as a central collecting agency for a number of charitable and philanthropic institutions which it was contemplated would become members in accordance with the express statutory authorization to that end contained in chapter 498 of the Laws of 1917. Among other possible advantages anticipated was the judicious elimination of the waste involved in separate appeals for contributions by each of these institutions as well as the annoyance and inconvenience to the public which necessarily resulted. In furtherance of these purposes, the by-laws of the Federation contained provisions prohibiting such units as affiliated themselves in the capacity of constituent members, from soliciting contributions or collecting funds, save permanent endowments or legacies; otherwise, all contributions were to be made directly to the Federation. In order, however, to permit membership of individuals in the constituent societies to continue, provision was made in its by-laws (Federation by-laws, art. VIII, § 1), that contributors to the Federation could designate the societies in which they desire to maintain membership and specify the amount to be allotted each such " Beneficiary Society " out of their payments to the Federation — this being known as *express* designation. In the absence of such precise designation, " The contributions of a member to Beneficiary Societies prior to their admission to the Federation shall be deemed continuous designations by such member unless affirmatively revoked or unless his contribution to the Federation shall not equal his total contributions to such Beneficiary Societies" — this being known as *constructive* designation.

Shortly after the organization of the Federation The Mount Sinai Hospital became an affiliate, and thus one of its constituent members or " Beneficiary Societies." This, respondents contend, completely extinguished the hospital's individual membership, except possibly for some twenty life members and members in perpetuity, and they accordingly argue that the petitioners are not members and, therefore, cannot be heard to attack the constitutionality of the statute in question, invoking the familiar principle that " one who does not belong to the class that might be injured by a statute

31

cannot raise the question of its invalidity." (*Red River Valley Bank* v. *Craig*, 181 U. S. 548, 558. See, also, *Massachusetts* v. *Mellon*, 262 id. 447.) As a consequence, it becomes essential at the very outset to determine whether or not the petitioners were actually members of The Mount Sinai Hospital at the time they instituted this proceeding. Respondents' proposition that membership in the hospital is now extinct as a result of its affiliation with the Federation is predicated upon the provision of its constitution that " membership * * * shall be subject to annual dues." It is argued that contributions to the Federation, even where the hospital was designated as beneficiary, were not to be, and were not in fact, kept apart by the Federation as separate trust funds, and that no sums were ever received by the hospital from the Federation specifically designated as dues of members of the hospital. Respondents, therefore, maintain that the hospital had no claim upon specific funds of the Federation for payments that might be regarded as *dues* within the meaning of The Mount Sinai constitution, and that the by-laws of the Federation deprived the hospital of the right to collect dues as such, from its members directly. In view of these circumstances, they urge that as a result the hospital no longer had any claim for dues against either its members or the Federation and that, therefore, " there is at the very least, grave and serious doubt as to the existence of membership as defined in the Constitution of the Hospital."

In this doubt I cannot share. Section 40 of the Membership Corporations Law of 1926* provides that " membership shall terminate by death, resignation, or otherwise." The only provision for the termination of membership to be found in the by-laws and constitution of the hospital reads as follows: " The Board of Trustees may erase from the roll of membership any member whose dues shall be more than one year in arrears." (Constitution, art. 3.) No claim is made that this provision has been invoked and that the names of the members of the hospital have been stricken from the roll in accordance therewith. The sole method of termination not having been employed, membership would appear still to exist. The very language of that section of the Membership Corporations Law compels this conclusion. Analysis of the fundamentals of the hospital's existence tends but to confirm it. The Mount Sinai Hospital was incorporated under a statute which expressly provided for *membership* and which is now embodied in legislation denominated " *Membership* Corporations Law." Its charter contained express refer-

---

* Formerly section 9 of the Membership Corporations Law of 1909.— [Rep.

ence to the fact that *membership* was contemplated. Indeed, this grant constituted nothing more than permission to the incorporators, and to such additional *members* as might thereafter be admitted, to operate a hospital through directors elected by the *members*. Elimination of membership in these circumstances may well render the charter a nullity. Without *membership* the society, the organization of which, as we have seen, had been authorized by the Laws of 1848, chapter 319, would very likely cease to exist. *Membership* lay at the very root and heart of its existence. Can the mere fact that the hospital became linked up with an entity whose by-laws obligated the former to refrain from collecting dues, work the destruction of *membership*, a most vital and basic thing in its entire structure? It may seriously be questioned whether a unanimous amendment to the hospital's constitution expressly providing for the cessation of membership, would be effective to keep the society in existence without a membership. It is even more doubtful if a mere agreement of the hospital, whether as a result of affiliation with the Federation or otherwise — there being no appropriate amendment of its constitution (Mount Sinai Constitution, art. 10) — could result in so radical a departure from its corporate structure *even if such a substantial change had been intended.*

Whatever doubts may, however, exist in the circumstances, there can be no question but that such an agreement or affiliation on the part of the hospital cannot reasonably be permitted to extinguish its membership *without any evidence that such a result was contemplated.* There is not the slightest indication in the papers before me that union with the Federation was intended to terminate the existence of membership in the hospital. Indeed, there is evidence directly to the contrary. The hospital still continued to have annual meetings of *members* at which trustees were elected. *Even after the taking effect of chapter 17 of the Laws of 1925,* an annual meeting of the *members* of the society was held. At this meeting the president, one of the respondents herein, announced that since the formation of the Federation the membership list had steadily dwindled — *not that membership had ceased.* He announced further that " when the Federation was formed it was thought that through re-designation each year, the contact between the members and the individual institutions would thus be kept alive, and it was also thought that new members of the Federation would designate individual societies with which they wished to become affiliated through the Federation." We have, then, not only the recognition of the fact that there were members as late as 1925, but the acknowledgment of the president himself that it was intended

that the membership should survive affiliation, and that it was expected this membership would even be augmented.

In the light of the foregoing, I am constrained to conclude that membership in The Mount Sinai Hospital was not extinguished and continues to exist. Respondents, however, maintain that even if that be so, the petitioners Goldman and Friend ceased to be members prior to their initiating this proceeding because they have failed to pay their dues to the hospital since it joined the Federation. It is conceded that they were members of the hospital at the time the Federation was incorporated, and it is not even pretended that they were stricken from the roll. Assuming, therefore, *arguendo*, that they were more than one year in arrears in the payment of their dues, they nevertheless remained members. As I read the constitution, failure to pay dues did not automatically terminate membership. Action by the trustees in that direction was necessary as an additional step. The provision of the constitution that " membership * * * shall be subject to annual dues " did not, as respondents maintain, make payment of each year's dues a condition *precedent* to membership for that year. If respondents' contention in this respect were sustained, the language " the board of trustees may erase from the roll of membership any member whose dues shall be more than one year in arrears," would be rendered meaningless. They urge, however, that the erasure of members from the roll was a mere formality. The very words used " any *member* whose dues shall be more than one year in arrears," would seem to indicate that a member continued to be such even though his delinquency had continued for more than a year, so long as he was not removed by the trustees. Moreover, if respondents were correct in their position, why was erasure made *discretionary* with the trustees instead of *mandatory* upon some secretarial or clerical functionary? Why was this power vested in the trustees rather than in some ministerial officer? The conclusion is irresistible that it was in contemplation that members should not be removed too hastily and those in default be given at least one year's opportunity of making good their arrears; that after that time the trustees would have the right, though not the duty, to expel. The sound reason for this must be obvious. Certainly, no one may venture to gainsay that membership such as this is productive of a distinct public benefit. Especially so, when, as here, the public usefulness aimed for is unstained by private interest, personal gain or selfish considerations. It unquestionably was not intended that the sort of delinquency discussed, should work the forfeiture now so emphatically urged. Thus, in *Davis* v. *Congregation Tephila Israel* (40 App. Div. 424) it was

stated (at p. 427) that where by-laws of a membership corporation did not provide that a default in dues terminated membership *ipsa facto,* but made it ground for expulsion merely, the person delinquent retained his membership until expelled by corporate action.    Substantially to the same effect are *Westchester Golf Club* v. *Pinkney* (43 Misc. 338); *Medical & Surgical Society of Montgomery County* v. *Weatherly* (75 Ala. 248).

I have proceeded on the assumption that the petitioners, as respondents claim, have failed to pay their dues to the hospital since its affiliation with the Federation.   The contrary, however, seems to be the fact.   Petitioners contributed to the Federation at a time when the latter's by-laws provided — as already pointed out — that they might specify the amounts to be paid respectively to designated affiliated societies in which they desired to retain membership.   Accordingly, they specified that ten dollars, the annual dues, of each of their annual contributions to the Federation should go to the hospital, Friend by express, and Goldman by constructive designation.   This, Federation was required to pay over to its " Beneficiary Societies."   It was only out of undesignated funds that the Federation was at liberty to pay its expenses and make discretionary allotments.   (Federation by-laws, art. VIII, §§ 2, 5.) Respondents concede that the hospital itself ceased to collect dues from its members *in accordance with the obligations imposed by the by-laws of the Federation.*   By the same token the hospital had a valid claim against the Federation under the latter's by-laws for any contributions · designated for it expressly or constructively, which the Federation failed to yield up.   The hospital, clearly, was entitled to the benefits as well as the burdens of the arrangement.   In associating itself with the Federation, it had consented to allow the latter to collect its dues and donations and to look to the Federation alone for payment.   Under the circumstances, payment to the Federation merely constituted remittance for the credit of the hospital.   As matter of fact, respondents admit that the amounts paid to the hospital by the Federation each year have been at least equal to the aggregate amount of the contributions during the given year, which were designated for the benefit of the hospital. Consequently, it may fairly be assumed that the hospital has in reality *received* the dues paid by the petitioners.   The lone circumstance that the Federation failed to hold each designated contribution apart as a separate trust fund for the society to which it was payable, cannot be material.   The fact is that petitioners did pay their dues and that the hospital received them.   For either or both of these reasons their names could not legally have been stricken from the membership roll by the trustees, even if an effort in this

direction had been attempted. Before leaving this feature of the case, it may prove interesting to note that pursuant to chapter 498 of the Laws of 1917, the Federation was empowered to enter into contracts with prospective constituent units by which individual membership in the latter might be " conferred " or continued. A serious dispute as to whether such a contract was made is here presented. But in view of the conclusion reached, it becomes needless to determine this.

The status of petitioners as members being, therefore, fixed, we come to the question of whether chapter 17 of the Laws of 1925 transcended the *reserved power* of the Legislature, and violated those provisions of our Federal and State Constitutions which forbid the impairment of the obligation of contracts, or the taking of property without due process of law. (U. S. Const. art. I, § 10; U. S. Const. Amendment XIV, § 1; N. Y. State Const. art. I, §§ 1, 6.) The origin of the reserved power is to be traced to the opinion of Mr. Justice STORY in the famous case of *Dartmouth College* v. *Woodward* (4 Wheat. 518). The State of New Hampshire had passed a law increasing the number of trustees of Dartmouth College from twelve to twenty-one and providing that the additional nine were to be appointed by the Governor and Council of New Hampshire. Previously the trustees had had the right to fill vacancies. According to this statute, the new board, which included the nine appointees of the State, was to have the power of filling vacancies as they occurred. In addition, a board of overseers was created, whose approval was necessary to the appointment of the president and professors of the college by the trustees. As Mr. Justice STORY well said (at p. 711): " If these are not essential changes, impairing the rights and authorities of the trustees, and vitally affecting the interests and organization of Dartmouth College under its old charter, it is difficult to conceive what acts, short of an unconditional repeal of the charter, could have that effect."

However, in concluding that the statute was unconstitutional and void, the learned jurist employed the following significant language (p. 712): " In my judgment it is perfectly clear, that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them, *or transfers them to other persons, without its assent,* is a violation of the obligations of that charter. *If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation; and I am, therefore, bound to declare that the acts of the legislature of New Hampshire,*

*now in question, do impair the obligations of that charter, and are, consequently, unconstitutional and void."* (Italics mine.)

Earlier in the same opinion, its distinguished author at page 708 had expressly approved of the doctrine that "the rights, legally vested in a corporation, cannot be controlled or destroyed by any subsequent statute, unless *a power for that purpose be reserved to the legislature in the act of incorporation."*

As a result of the public alarm and protest caused by the decision in this celebrated cause and the feeling that "there never should be another corporation with powers beyond the control of the legislature" (*Lord* v. *Equitable Life Assurance Society,* 194 N. Y. 212, 221), the law-making body of this State adopted Mr. Justice STORY's suggestion and made all charters subject to alteration in its discretion. This had become the permanent policy of the State when the Constitution of 1846 was adopted. Since that year the Constitution has provided that "all general laws and special acts" of incorporation may be "altered from time to time or repealed." (N. Y. State Const. art. 8, § 1.) This provision applies with equal force to charters granted under such general laws or special acts. (*Lord* v. *Equitable Life Assurance Society, supra.*) The law under which The Mount Sinai Hospital was incorporated provided that "the legislature may at any time amend, annul or repeal any incorporation formed or created under this act." (Laws of 1848, chap. 319, § 10.) It is not to be supposed, however, that these reservations of power to amend or repeal invested our Legislature with unlimited control over corporations which they had created. The statement by the Supreme Court of the United States which follows has often been quoted for the purpose of indicating the limitations in this connection imposed by the Constitution: "The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration. *Beyond the sphere of the reserved powers, the vested rights of property of corporations,* in such cases, are surrounded by the same sanctions and are as inviolable as in other cases." (*Shields* v. *Ohio,* 95 U. S. 319, at pp. 324, 325.) (Italics mine.)

The same doctrine is enunciated in somewhat different language in *Lord* v. *Equitable Life Assurance Society* (*supra*) by our Court of Appeals (at p. 227): "The right to amend a charter, however, does not include the right to take away money invested in reliance thereon, or property acquired thereunder. The power of amendment reserved by the Constitution or statutes of a state does not

permit interference with property or property rights, because they are protected by the Constitution of the United States. When the legislature has created a corporation and has given it power to acquire property, it cannot take away the property so acquired without providing for compensation. (*Mayor, etc., of N. Y.* v. *Twenty third St. Ry. Co.,* 113 N. Y. 311, 317.)" (See, also, *Sinking-Fund Cases,* 99 U. S. 700.)

There can be no doubt but that chapter 17 of the Laws of 1925 works a decidedly radical change in the corporate structure of the hospital. By taking from its members the right to vote for trustees and authorizing the latter to elect their own successors, the law, in substance and reality, removes the valuable properties of the hospital beyond the control of the members and confers them upon the trustees. In the absence of a reservation of power to amend or repeal, the law would clearly be unconstitutional under the doctrine of the *Dartmouth College* case. The power to amend or repeal having been expressly reserved, however, it becomes necessary to consider whether the constitutional limitations upon its exercise have actually been exceeded. The case of *Lord* v. *Equitable Life Assurance Society* is relied upon by the petitioners as authority for their proposition that even under the reserved power the Legislature may not substantially undermine, much less destroy, the right to vote for directors or trustees. That case, however, involved a business corporation. A stockholder in such a corporation undoubtedly has a property investment whose value is intimately bound up with his right to select those who are actively to conduct the corporation's affairs. As Judge VANN there so aptly said (at pp. 228, 229): " The right to vote for directors, therefore, is the right to protect property from loss and make it effective in earning dividends. In other words, it is the right which gives the property value and is part of the property itself, for it cannot be separated therefrom. * * * To absolutely deprive him of the right to vote, therefore, is to deprive him of an essential attribute of his property." It is impossible to dispute the soundness of the conclusion that a law which destroyed the stockholders' right to vote would seriously impair vested property rights, namely, the stockholders' investment in the corporation. Without any question, this would go beyond the proper limits of the Legislature's reserved powers. Therefore, if The Mount Sinai Hospital were a business corporation; if its members had a right to dividends, or a right to share in the assets upon dissolution; if, indeed, its members had *any* pecuniary or property interest in its affairs, the reasoning in the *Lord* case would unquestionably cast grave doubt upon the constitutionality of the statute here involved.

The fact is, however, that The Mount Sinai Hospital is not a business corporation, but a charitable or eleemosynary one. Its object is the public welfare, not private gain. By legislation enacted in 1904 (Laws of 1904, chap. 365) its certificate of incorporation was amended so that its beneficent purposes became " the support and maintenance of an institution to be known as the Mount Sinai hospital, for the purpose of affording dispensary service and medical and surgical aid and nursing sick and disabled poor of the city of New York and others of any race, creed or nationality." Various acts appropriating public moneys to the hospital have been passed from time to time, all entitled " An Act making appropriations for certain public and charitable institutions." (Laws of 1864, chap. 401; Laws of 1866, chap. 774; Laws of 1867, chap. 751; Laws of 1869, chap. 857; Laws of 1870, chap. 704; Laws of 1871, chap. 869.) As matter of fact, the petitioners, in their briefs, acquiesce in respondents' position that the hospital is a charitable corporation. From this, there would seem to flow important consequences. The members of a charitable corporation, obviously, are not entitled to receive dividends or other emolument, or profit materially as a result of its operations. In the event of dissolution, they would have no right to share in the institution's assets. The distinction between business and charitable corporations in this respect is enunciated with great clarity in the well-known case of *Mormon Church* v. *U. S.* (136 U. S. 1, 47): " When a business corporation, instituted for the purposes of gain, or private interest, is dissolved, the modern doctrine is, that its property, after payment of its debts, equitably belongs to its stockholders. But this doctrine has never been extended to public or charitable corporations."

Particularly is this true " where the property has been the resulting accumulation of ten thousand petty contributions, extending through a long period of time, as is the case with all ecclesiastical and community funds. In such a case the only course that could be satisfactorily pursued, would be that pointed out by the general law of charities, namely, for the government, or the court of chancery, to assume the control of the fund, and devote it to lawful objects of charity most nearly corresponding to those to which it was originally destined. It could not be returned to the donors, nor distributed among the beneficiaries." (Id. pp. 58, 59.) Reinforcement for this doctrine, if it be necessary, may be found in *Centennial & M. Assn. of Valley Forge* (235 Penn. St. 206, 213): " ' On dissolution the property of a charitable association does not revert to the donors nor may it be divided among the members of the association, but it should be appropriated to the purposes most nearly akin to the intent of the donors under the direction

of the court.' " An excellent case in point is that of *Sherman* v. *Richmond Hose Co.* (230 N. Y. 462), where the Court of Appeals said (at p. 472): " Upon the dissolution of such a corporation, personal property bequeathed to it, dedicated to public and charitable purposes, was disposed of by the state with due regard to the objects to which it was dedicated. It was not the property of the corporation to be divided among its members as would be the property of a purely private or business corporation. It held the property in trust — not a trust imposed by the donor but by the charter which required the corporation to perpetually devote its funds to such purposes. (*Mormon Church* v. *U. S.*, 136 U. S. 1; *Centennial & M. Assn.*, 235 Penn. St. 206; *Duke* v. *Fuller*, 9 N. H. 536; *Sumner Lodge* v. *Odd Fellows Home*, 77 N. J. Eq. 386; *Mason* v. *Atlanta Fire Co.*, 70 Ga. 604.) " (See to the same effect *Bliss* v. *Linden Cemetery Assn.*, 81 N. J. Eq. 394.)

A differentiation is made between real and personal property in the *Mormon Church* case. Upon dissolution of a charitable corporation (p. 47) " its personal property, like that of a man dying without heirs, ceases to be the subject of private ownership, and becomes subject to the disposal of the sovereign authority; whilst its real estate reverts or escheats to the grantor or donor, unless some other course of devolution has been directed by positive law, though still subject  *  *  *  to the charitable use." At page 48 the opinion continues: " Where a charitable corporation is dissolved, and no private donor, or founder, appears to be entitled to its real estate (its personal property not being subject to such reclamation), the government, or sovereign authority, as the chief and common guardian of the State, either through its judicial tribunals or otherwise, necessarily has the disposition of the funds of such corporation, to be exercised, however, with due regard to the objects and purposes of the charitable uses to which the property was originally devoted, so far as they are lawful and not repugnant to public policy." There is nothing in the papers before me to suggest that any real property owned by the hospital was donated to it, and if there are such donations, there is nothing to indicate that any of the donors or their heirs are still *in esse* and ascertainable. True it is, that reference is made in the answer to a grant by the city of New York, but this was held to be unconstitutional, and it does not appear whether the property is now owned by the hospital. It may well be that such real estate as the hospital owns was purchased by it with its own funds, in which event there could be no reverter. Respondents, however, mention various endowment funds, endowed beds and special funds which are in the possession of the hospital, but no data are furnished as to

whether there is to be any reverter to the various donors. In the absence of express provision for reverter, there would be none (*Associate Alumni* v. *Theological Seminary*, 163 N. Y. 417); the funds would pass to the State with the remainder of the personalty to be administered under the *cy pres* doctrine. Under the circumstances, it is not to be presumed that the dissolution of the hospital would result in the transfer of any of its properties to any one other than the State.

What, then, were the rights of the *members* of The Mount Sinai Hospital at the time chapter 17 of the Laws of 1925 was enacted into law? The hospital's continued existence, as we have seen, carries with it no pecuniary or material advantage to the members. Its dissolution would entitle them to no part of its assets or properties. Whether any of the properties would revert to the donors, if any, or whether they would all pass to the State — in both cases " still subject to the charitable use "— it is clear that *in either event the members themselves would receive nothing.* If they had any right at all, it was clearly that of selecting the hospital's trustees. Thus, the members had not the power to alter the hospital's constitution, except upon recommendation of the board of trustees. To adopt the language of petitioners' brief, " the choice of directors * * * in a charitable corporation * * * is in effect the *sole* right of the members." This " sole " right, petitioners argue, is a vested property interest of which the members cannot constitutionally be divested, even in the proper exercise of the Legislature's reserved power. It may be conceded that the right to control property by selecting those who shall manage it is a valuable property right in contemplation of law. Petitioners apparently overlook, however, that this so-called property right did not exist independently of the charter which the Legislature had granted to the hospital. It was not, for example a special franchise which came into being in the exercise of the powers conferred by the charter rather than by virtue of the charter itself, as was the case in *People* v. *O'Brien* (111 N. Y. 1). The right of members to vote for trustees was created by the charter itself as it was included in the Legislature's grant to the hospital. It was an inherent and integral part of the charter and had no separate existence apart from it. Granting that this right to vote was a property right, does it follow that it was of the kind which the Legislature could not constitutionally impair or destroy?

Under the reserved power the Legislature could undoubtedly repeal the charter of the hospital at its pleasure, without regard to its motives and without the possibility of successful judicial interposition. (*Calder* v. *Michigan*, 218 U. S. 591; Thomp. Corp.

[2d ed.] § 340.) As Mr. Justice HOLMES so tersely said in *Calder* v. *Michigan* (at p. 600): " This really is too plain to require the argument that we have spent upon it." It is perfectly true that the Legislature cannot by repeal divest rights which have vested in the exercise of powers conferred by the charter; it cannot, for example, confiscate special franchises which the corporation has acquired during its existence. (*People* v. *O'Brien, supra; Lord* v. *Equitable Life Assurance Society, supra;* Thomp. Corp. [2d ed.] 387; 7 Fletcher Corp. 7589, 7590.) But the Legislature may terminate all rights derived solely from the charter, as distinguished from those independently acquired in the exercise of powers granted by the charter. Any other view would render idle the reservation of the right of repeal. The distinction is appropriately stated in *Railroad Co.* v. *Maine* (96 U. S. 499, 510): " By the reservation * * * the State retained the power to alter it in all particulars constituting the grant to the new company, formed under it, of corporate rights, privileges, and immunities. The existence of the corporation, and its franchises and immunities, derived directly from the State, were thus kept under its control. *Rights and interests acquired by the company, not constituting a part of the contract of incorporation, stand upon a different footing.*" (Italics mine.) A lucid statement of the proposition is to be found in Thompson on Corporations (2d ed. at p. 387): " This rule as to vested rights does not apply to any right in any corporator which is derived solely from the charter, created by the act of the incorporation only, and independent of any act done by him, or by the corporation itself under powers granted by the act, which is so vested that it cannot, by an act of the legislature, be changed. All rights which are not constitutional, depend upon the pleasure of the legislature." It is clear, therefore, that the Legislature could have repealed the charter of the hospital at will, and thereby destroyed the members' right to vote. In that event, there would no longer be either members or trustees, and the right to participate in elections would necessarily perish.

Can it then be successfully maintained that chapter 17 of the Laws of 1925 is unconstitutional on the ground that it deprives the members of their right to vote for trustees? Can the Legislature be denied the power to take away *by amendment* a right which it unquestionably had the power to destroy at any time *by repeal?* Can the question of whether the " due process " and similar provisions of our Federal and State Constitutions have been violated depend upon the form, rather than upon the substance, of the law whose constitutionality is attacked? These are questions which would appear to answer themselves. Once it is

perceived that the right of members to vote can be destroyed by the Legislature at will, the conclusion becomes inevitable that chapter 17 of the Laws of 1925, which did no more than take away that right, represents a constitutional exercise of the reserved power.

The petitioners, however, assert with some force that it is fallacious to assume that the power to repeal is greater than the power to amend. It is quite true that the reservation of the power to repeal may often prove inadequate to validate an attempted exercise of the power to amend. Exercise of the power of repeal can never fully destroy vested property rights. Exercise of the power to amend may or may not do so, depending on the circumstances. *Repeal* of a charter merely cuts off that which the State itself granted. And it may rightfully be maintained that the grant was made upon the assumption that the State unequivocally retained the reservation. In the case of business corporations, it cannot be said to confiscate the property rights of the stockholders, for the assets are distributed among them. Nor does it involve property rights in the case of charitable corporations, for the reasons already assigned. As the highest court of the land said, in differentiating between the power to amend and the power to repeal: " To terminate the charter and thus end the legal life of the company does not take away its property, but, on the contrary, leaves it all to the shareholders of the company after the payment of its debts." (*Lake Shore & Michigan Southern R. Co.* v. *Smith*, 173 U. S. 684, 698.)

*Amendment* of a charter may on the other hand seriously affect the property rights of stockholders in a business corporation. It may, without their consent, change the character of the corporation in which they have invested their moneys and thereby produce a " diversion of funds." (See *Bryan* v. *Board of Education*, 151 U. S. 639.) For example, a legislative amendment which transformed a railroad corporation into a brewery would expose the stockholders' investment to risks entirely foreign to those contemplated by them when they subscribed for stock. Such an amendment would impair vested rights of property which had been acquired, not by virtue of, but in the exercise of the powers conferred by the charter. Even the reservation of the power to repeal or amend could not render an amendment of that·character constitutional in the absence of unanimous assent on the part of the stockholders. Yet an absolute repeal of the corporate charter would undoubtedly be upheld. The case of *Lord* v. *Equitable Life Assurance Society* illustrates the distinction. There the existence of the reserved power to repeal did not deter the court from declaring that the right of stockholders to vote for directors could not consti-

tutionally be taken from them by amendment. Judge VANN's opinion indicates, however, that the basis of that conclusion was the fact that the right to vote for directors was the right which contributed to the value of the stockholders' property, and that it was in reality an integral part of their investment. Accordingly, an amendment which disfranchised the stockholders would do more than take away the right to vote which the Legislature had itself granted. Such an amendment would substantially affect vested property rights whose value in some measure at least, depended upon the existence of the right to vote, and would, therefore, contravene the constitutional inhibition. In the case of a charitable corporation, however, the basis for this differentiation between the power to amend and the power to repeal is lacking. The members of a charitable corporation have no property interest in the corporation's affairs which would be impaired or affected by an amendment depriving them of the right to vote for trustees. By such an amendment the Legislature would merely be taking away that which it had itself conferred without affecting property rights independently acquired.

The conclusion that chapter 17 of the Laws of 1925 does not transcend the reserved power of the Legislature is not without authority to support it. The amendment to the charter in the *Dartmouth College* case differed in no material respect from that involved in the instant case. There, as here, the method of selecting trustees was substantially altered by the Legislature without the consent of those whose voting rights were thereby impaired. Although the law was declared unconstitutional in that case, on the ground that it impaired the obligations of the contract between the college and the State, Mr. Justice STORY definitely intimated, as already observed, that a reservation of power to make such a change would have produced a different result. The significance to be attached to the implications of the *Dartmouth College* case may be appreciated by reference to the language of the United States Supreme Court in *Looker* v. *Maynard* (179 U. S. 46, 54): " Remembering that the *Dartmouth College* case (which was the cause of the general introduction into the legislation of the several States of a provision reserving the power to alter, amend or repeal acts of incorporation,) concerned the right of a legislature to make a change in the number and mode of appointment of the trustees or managers of a corporation, we cannot assent to the theory that an express reservation of the general power does not secure to the legislature the right to exercise it in this respect."

In the case of *Allen* v. *McKean* (1 Sumn. 276; 1 Fed. Cas. 489) Mr. Justice STORY, fourteen years after the decision in the *Dart-*

*mouth College* case, held unconstitutional an act of the Maine Legislature which increased the number of trustees and overseers of Bowdoin College and gave the Governor and Council of Maine the right to appoint some of the trustees and overseers, one which they had not theretofore enjoyed. For the purpose of one branch of his opinion he quoted from the charter of the college, in the following language (at p. 501): " The president and trustees, and the overseers of Bowdoin College shall have, hold, and enjoy their powers and privileges in all respects, subject, however, to be altered, limited, restrained, or extended by the legislature, etc., as shall, etc., be judged necessary to promote the best interests of said institution." This language, he declared, was insufficient to entitle the Legislature to substitute itself for the charter board in the management of the college. He pointed out, very properly, that it could not be construed to include a power to annul the charter and he went on to show that such authority had been intentionally withheld. For those reasons he concluded that the act which attempted to transfer the powers and privileges of the charter board to the Governor and Council of the State was unconstitutional. It is important to observe, however, that the opinion makes certain that a different conclusion would have been reached had the reservation of power included the right of repeal. " But how can they hold or enjoy any such powers or privileges, if these are liable to be transferred to any other persons, and taken from themselves? If such had been the intent of the parties, other language would have been used; the charter, the college, and the boards would have been made subject to the pleasure of the legislature. The power to annul and transfer the powers and privileges would have found its way into the act in a clear and determinate manner." (1 Fed. Cas. 501, 502.) The implications of this case — indeed its express language — establish it as positive authority in support of the constitutionality of the statute here involved.

In the *Mormon Church* case an act of Congress was upheld as constitutional which repealed the charter of the Mormon church and transferred its assets to trustees appointed by the probate courts of Utah. Thus transferred, they included not only property which had been forfeited to the government, but even such as had passed to it by reason of the fact that the repeal of the charter left no trustee. This case is indicative of the extensive powers of the Legislature with regard to charitable corporations. In *Westminster Presbyterian Church* v. *Trustees of Presbytery* (142 App. Div. 855) the court assumed that the plaintiff, a charitable corporation, had been validly dissolved by an order of the Presbytery and,

therefore, upheld the constitutionality of a statute whose effect was to transfer the control of the plaintiff's assets to the defendant. LAUGHLIN, J., writing, said (at p. 875): " Moreover, I am of opinion that the statute is directly in point and entitled the defendant to the possession of the property. There is no real question with respect to its constitutionality. Neither the members of the congregation nor the trustees had any property right in the property of the corporation dedicated in perpetuity to religious and charitable uses. (*Watson* v. *Jones*, 13 Wall. 679, 726; *Mormon Church* v. *U. S.*, *supra*.) The property will still be held to be administered for the same purposes, and it cannot be sold without the consent of the court. It was competent, I think, for the Legislature to enact these statutes directing with respect to the custodian of this property in the event specified in the statute. The authority of the Legislature with respect to dissolving corporations and regulating trusts, and particularly the custody and control of property dedicated in perpetuity to religious and charitable uses, is quite extensive. (*Mormon Church* v. *U. S.*, *supra*.) "

The Court of Appeals subsequently overruled this decision but only on the ground that the Appellate Division had erroneously accepted as valid the dissolution of the plaintiff corporation by order of the Presbytery, as distinguished from a necessary act of the Legislature. It was there intimated that the decision might have been correct if the corporation had actually been dissolved by such an act. (*Westminster Presbyterian Church* v. *Presbytery of New York*, 211 N. Y. 214, 225, 226.) The opinion of the Appellate Division in so far as it proclaimed the authority to dissolve charitable corporations and to transfer their properties, as the Legislature might see fit, is left unimpaired. Consequently, it would be extremely difficult, if at all possible, to find justification for declaring unconstitutional a law which takes the right to elect trustees from the members of a charitable corporation, and confers it upon its trustees.

In support of their proposition that the right to vote, even where unconnected with a pecuniary or property interest is a property right which cannot be taken away by the Legislature, petitioners cite various authorities. *Sheriff* v. *Lowndes* (16 Md. 357) is clearly inapplicable for the reason that there was no reserved power provision. *Ohio* v. *Neff* (52 Ohio St. 375) is clearly distinguishable for the Legislature had reserved to itself the power to alter or amend, but *not to repeal*. The effect of a failure to reserve the power to repeal is indicated not only by Judge STORY's opinion in *Allen* v. *McKean*, but also by the following extract from Thompson on Corporations (2d ed. 378): " It may be remarked first,

that where the power reserved is simply to amend a charter, the problem is not difficult, because under a right to amend an entirely new and different charter could not be substituted, nor could the existing charter be taken away. But under a reserved right to amend, alter, or repeal, the question is more difficult." In so far as *Sage* v. *Dillard* (54 Ky. [15 B. Mon.] 340) is in conflict with the views herein expressed, I am unable to accept the decision as sound.

It remains to consider the objection that the Legislature singled out for disfranchisement the members of The Mount Sinai Hospital, to the exclusion of other corporations similarly situated and incorporated under the identical general law (*i. e.*, the act of 1848), and thus denied to the members of the hospital the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. No serious attempt is made to sustain the legislation upon the theory that it is based upon a reasonable classification. Its discriminatory character is in effect conceded. The question is, therefore, squarely presented whether the Legislature may exercise its reserved power to amend or repeal corporate charters without regard to the constitutional guaranty of the equal protection of the laws. On this subject there is practically no authority, perhaps for the reason that most special legislation is obtained at the instance of those concerned and is not made the subject of attack.

I am of the opinion that the Legislature may properly discriminate in its exercise of the reserved power, without necessarily running foul of the equal protection provisions of the Fourteenth Amendment. Assume the existence of 1,000 corporations — which is not at all unlikely — organized under 1,000 special acts of the Legislature, each reserving the power to amend or repeal. Could not the Legislature repeal the act creating one of these corporations without at the same time repealing all of the same class? Would such action be said to be doing violence to the constitutional guaranty in this direction? Would there be any basis for distinction if the 1,000 corporations had all been organized under one general law? I think not. The denial of equal protection, if such were the result, would be the same in either event. Obviously, this cannot depend upon whether the entities involved were incorporated under general or special laws — the very same discrimination is bound to result. The validity of the discrimination, therefore, is a question to be determined quite apart from the general or special character of the law pursuant to which the given corporations were formed.

32

The right to function as a corporation does not exist except as a privilege granted by the State. (*People* v. *Beakes Dairy Co.*, 222 N. Y. 416.) Cannot the State in making the grant expressly reserve to itself the power to repeal or revoke without regard to like privileges granted to corporations similarly situated? Here, the right to discriminate was expressed with greater definiteness than is customary, in the act of 1848: " The legislature may at any time amend, annul or repeal *any* incorporation formed or created under this act." (Laws of 1848, chap. 319, § 10.) Even in the absence of language suggesting the right to discriminate, I think it would come as a shock to be advised that the Legislature under its reserved power cannot repeal one corporation's charter without repealing the charters of all corporations belonging to the same class. I believe that a reservation of the power to discriminate is fairly to be *implied* in the absence of express language authorizing it. However that may be, the language of the act of 1848 is so clear as to require no support from implication. I can conceive of no valid reason why the Legislature should not be permitted to grant corporate charters on condition that they may be amended or repealed without regard to other corporations, even if the latter might be classified in the same category. Cases are cited by the petitioners to support their position upon this question. In all these, however, it will be found that the legislation attacked as unconstitutional affected property rights which existed independently of legislative grant. In none of them was the thing that the Legislature took away or impaired the very thing which it had itself granted upon the express condition that it might at any time be taken away. There are cases where laws passed under the reserved power have been sustained as constitutional, though they have been directed at individual corporations. For example, in *Mayor, etc.,* v. *Twenty-third St. R. Co.* (113 N. Y. 311) the Court of Appeals upheld the constitutionality of a law which imposed burdens upon a single corporation, in spite of the fact that it had been organized under a general law. At the same time it may be proper to observe that the point of equal protection of the laws was not raised. The only case I have been able to find in which the question is discussed in a situation at all similar to that prevailing here is *Bush* v. *New York Life Ins. Co.* (135 App. Div. 447). There the claim was made that section 96 of the Insurance Law, the effect of which was to permit only the Metropolitan Life Insurance Company to issue unlimited insurance, was unconstitutional in that it denied the equal protection of the laws to other insurance companies similarly situated. This contention was disposed of by the court in the following language by INGRAHAM,

J. (at p. 451): " The claim is made that in some way the State of New York is prohibited from restricting corporations that it has created as to the amount of new business which they shall engage in, or limiting them as to the business in which they can engage. I suppose that there could be no question as to the power of the State to grant such power to corporations which it organized as it pleased, or that under the reservation of power by the present Constitution (Art. 8, § 1) the State had the right to amend or modify the charter of any corporation, or repeal or annul said charter altogether; and the fact that either by the original charter or an amendment to the charter of a corporation such corporation was given greater power than that given to other corporations, *or that the powers of one corporation were restricted so that it had the right to exercise less power than other corporations organized by the State,* was not a violation of any constitutional right assured to any of the corporations by either the Constitution of this State or the Constitution of the United States.  *  *  *  I cannot see that this bill violates any provision of the Federal Constitution. *Equal protection of the law does not require a State to grant to each corporation that it organizes the same power to transact business or in relation to its business.*  It certainly would be within the power of the State to annul the charter of every life insurance company that it had organized, if it wished, without infringing any provision of the Federal Constitution."  Continuing, the court distinguished the case of *Cotting* v. *Kansas City, etc.,* cited by petitioners here, in the following language (at p. 452): " The case of *Cotting* v. *Kansas City Stock Yards Co.* (183 U. S. 79), which is relied upon by the plaintiff, was one regulating in the State of Kansas the business of public stock yards, and applied to corporations as well as to private individuals.  It was not a law regulating the powers of a corporation organized by the State of Kansas; and what was said by the court in that case has clearly nothing to do with the question as to the power of the State to regulate the business of corporations organized under its laws."

A further ground of distinction is the fact that the case involved more than the taking of what the Legislature itself had granted, for it affected adversely the stockholders' investment.  The opinion of Judge POUND in the famous Ku Klux Klan litigation (*People ex rel. Bryant* v. *Zimmerman,* 241 N. Y. 405), in which he declared (at p. 410) that the Legislature " cannot legitimately vent its permanent or passing wrath on a single society unless such society is known or shown to be in a class by itself," is manifestly not in point.  That case dealt with an unincorporated association and the reserved power was not involved.  On principle and on author-

ity, therefore, I am constrained to conclude that chapter 17 of the Laws of 1925 did not violate the provisions of the Fourteenth Amendment prohibiting legislation denying the equal protection of the laws.

But petitioners, by challenging the good faith of the board of trustees in procuring the legislation complained of, and by pointing to what is claimed to be the anomalous situation resulting, have seemed to cast doubt upon the propriety of the statute on those grounds. They assert that the effect is " to change the corporation from a democracy to a self-perpetuating oligarchy and to make the institution in the strictest sense of the very invidious phrase a ' close corporation.' The policy of the state, as the whole history of legislation on the subject has shown, is just the other way." They urge that the only purpose which actuated the trustees was the desire to perpetuate themselves in power and to prevent a failure to re-elect them as their respective terms expired. In reply respondents seek to justify their action on the ground that after the hospital's affiliation with Federation there was considerable doubt as to whether membership in the hospital continued to exist, and corresponding uncertainty as to the validity of the elections of trustees that were to ensue. Accordingly, they urge that it was their purpose to insure the continued management by trustees whose title to office could not be questioned. It is indeed to be lamented that these differences have occurred, threatening to engender discord where unity should prevail. For three-quarters of a century united and harmonious endeavor in a common cause has given the institution an enviable and nationwide reputation. It would be a public misfortune if disagreements were to impede the administration, and possibly hinder the growth, of the great hospital of which the community is so justly proud. In truth, it is more than a hospital; it is an American seat of learning, where science and skill are richly developed in the service of mankind. Furthermore, a breach of this character may produce grave and far-reaching consequences in other directions. But the difficulty is that these considerations of sentiment cannot enter into the disposition of the controversy. The constitutionality of an act of the Legislature cannot depend upon the influences brought to bear to secure its enactment or upon the purposes which may have impelled the law-making body. " It would introduce a new uncertainty into the law if the constitutionality of statutes were to be judged by the motives and purposes of those who persuaded the legislature to enact them." (*Polk* v. *Mutual Reserve Fund,* 207 U. S. 310, 326.) The same thought was expressed in somewhat different language by Mr. Justice Holmes in *Calder* v. *Michigan*

(218 U. S. 591, 598): " But we do not inquire into the knowledge, negligence, methods or motives of the legislature if, as in this case, the repeal was passed in due form."

Finally, is there anything extraordinary in the management of charitable corporations by self-perpetuating boards of trustees or directors?    The respondents argue that " many, if not the majority, of the great educational institutions of the United States and its great charitable foundations and organizations are managed and controlled by such self-perpetuating boards of trustees, as for example, the Presbyterian Hospital in the City of New York, Roosevelt Hospital, The New York Hospital, St. Luke's Hospital, Sydenham Hospital, New York Skin and Cancer Hospital, The Metropolitan Museum of Art, Museum of Natural History, the Botanical Gardens, the Home for Aged and Infirm Hebrews, St. Mary's Hospital for Children, Vassar Brothers Hospital at Pough-keepsie, New York, and many other institutions of similar character."    It may well be, as petitioners suggest, that the provisions for self-perpetuation are contained in the original charters, constitutions or by-laws of some or all of these organizations and for that reason, if for no other, it is impracticable to seek guidance in the conditions existing in other eleemosynary corporations. But this much is certain, that the examples illustrate the fact that no singular or unprecedented form of administration has been introduced by the legislation challenged.

The motion is denied.